823 F.2d 8
 O. RODRIGUEZ, Plaintiff-Appellant,
v.
Charles JAMES, Superintendent, Melvin Williams, Deputy
Superintendent, K. Trim, Senior Mail Clerk, K. Baase, Record
Coordinator, DOCS Chief Employee of Records, Albany, NY, and
Arthur Leonardo, Deputy Commissioner, Defendants- Appellees.
 No. 826, Docket 86-2428.
 United States Court of Appeals,
Second Circuit.
 Submitted March 2, 1987.
Decided June 29, 1987.
 
 O. Rodriguez, pro se.
 Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y. (Peter H. Schiff, Deputy Sol. Gen., Wayne L. Benjamin and Denise A. Hartman, Asst. Attys. Gen., Albany, N.Y., of counsel), for defendants-appellees.
 Before OAKES and WINTER, Circuit Judges, and ZAMPANO, Senior District Judge.*
 WINTER, Circuit Judge.
 
 
 1
 O. Rodriguez, a prisoner in the custody of the New York State Department of Correctional Services ("DOCS"), alleged in his complaint that several DOCS officials had violated his constitutional rights while he was imprisoned at the Collins Correctional Facility ("Collins"). Rodriguez's principal claim was that his first amendment rights were violated by Collins officials' implementation of a DOCS regulation that required inmates to submit all outgoing business mail in unsealed form for inspection. He also claimed that his transfer to the Orleans Correctional Facility ("Orleans") was intended to frustrate his pursuit of legal remedies. Chief Judge Curtin granted summary judgment against Rodriguez, and this appeal followed.
 
 BACKGROUND
 
 2
 From October 11, 1985 to March 15, 1986, Rodriguez was an inmate at Collins, a "medium A" security facility in Helmuth, New York. Sometime in late October 1985, he submitted two sealed letters to the prison mailroom for mailing. Both letters were addressed to businesses; one was addressed to The Sharper Image, the other to Stereo World Electronics Discounters. According to Rodriguez, the first was a notice of a change of address, and the second was an inquiry about overdue merchandise. Pursuant to DOCS Directive No. 4422, those letters were returned to Rodriguez unopened and unmailed.
 
 
 3
 Directive 4422, issued by DOCS on December 7, 1983, modified the Inmate Correspondence Program, which regulates the exchange of correspondence between inmates and other persons. The directive was issued after a number of restrictions on inmate mail privileges were invalidated by this court in Davidson v. Scully, 694 F.2d 50, 52 & n. 3 (2d Cir.1982). As a result of the directive, inmates may now submit most of their outgoing personal mail to the prison mailroom already sealed. Inspection is allowed only upon reasonable suspicion that the contents constitute a threat to safety.
 
 
 4
 Business mail, however, is treated differently. Correspondence addressed to commercial firms must be submitted unsealed and is subject to inspection. This requirement was devised after a number of inmates had ordered merchandise or services without having sufficient funds to make payment. Any business mail that obligates an inmate's funds must receive prior approval of the prison superintendent. The inmate must send advance payment in the form of a check drawn on his prison account for any merchandise ordered by mail. As an additional measure, the Deputy Commissioner of DOCS ordered that all outgoing inmate mail be stamped with the name of the correctional facility. A subsequent revision of Directive 4422 excluded from the definition of "business mail" correspondence to the media not obligating the inmate's funds.[1]
 
 
 5
 In a letter to Rodriguez explaining the return of the two sealed letters and a third unmailed letter to Radio Shack, Kay Baase, the Collins Inmate Records Coordinator, specifically quoted Directive 4422, Sec. III(E)(2). Baase also noted that had the mailroom employees been able to verify that The Sharper Image and Stereo World letters merely effected a change of address and inquired about overdue merchandise, "they would have promptly been dispatched."
 
 
 6
 On December 27, 1985, Rodriguez requested that a letter addressed to Senator Edward Kennedy be sent via certified mail. Prison records, including a Postal Service receipt, indicate that the letter was sent on December 30, that Rodriguez was billed for the certified mail charge, but the letter was never received by Senator Kennedy's office. Two tracers submitted by Collins officials at Rodriguez's request received no response from the Postal Service.
 
 
 7
 On March 15, 1986, Rodriguez was transferred to Orleans, another "medium A" security facility, as part of an inmate "swap" between the two prisons. Rodriguez and one other inmate at Collins were exchanged for two inmates at Orleans to allow the Orleans inmates to participate in programs offered only at Collins. Officials at Orleans apparently initiated the exchange.
 
 
 8
 Rodriguez's complaint alleged that four officials at Collins, including Baase, had deliberately transferred him to Orleans to prevent "legal redress against them for their violations of his rights," to deny him his job assignment at Collins, and to cause him mental anguish. Rodriguez also alleged that those four officials had destroyed or suppressed his mail to Senator Kennedy and had refused to send out his sealed business mail. Finally, Rodriguez alleged that Arthur Leonardo, Deputy Commissioner of DOCS, and an unnamed DOCS official had approved and implemented the "illegal and unconstitutional" Directive 4422.[2] All of these actions, Rodriguez claims, were violations of his civil, statutory, human and constitutional rights. Each of the five named defendants moved for summary judgment and submitted numerous supporting affidavits and prison records. On November 5, 1986, the district court granted summary judgment in favor of all defendants.
 
 DISCUSSION
 
 9
 In granting summary judgment, Chief Judge Curtin correctly rejected as lacking any factual basis Rodriguez's claims that Collins officials tampered with the Kennedy letter and illegally transferred him to Orleans. Evidence submitted by the defendants demonstrates that the Kennedy letter was mailed by Collins prison officials and was lost after it had passed into Postal Service custody. Moreover, Rodriguez has offered no evidence contradicting the defendants' submissions indicating that his transfer was carried out for legitimate purposes.
 
 
 10
 We limit our further discussion to Rodriguez's claim that the refusal of prison officials, pursuant to Directive 4422, to mail Rodriguez's sealed business correspondence abridged his first amendment rights.[3] Rodriguez's challenge to the inspection of his business mail does not include a claim that such inspection deters or "chills" prisoners from engaging in commercial correspondence. Certainly, there was nothing in the letters that he intended to send that was either personal, see Wolfish v. Levi, 573 F.2d 118, 130 (2d Cir.1978) (chilling of "tender note, so important to the morale of the incarcerated individual") or political, see Procunier v. Martinez, 416 U.S. 396, 415, 94 S.Ct. 1800, 1812, 40 L.Ed.2d 224 (1974) (invalidating prison regulation authorizing censorship of mail that, inter alia, " 'express[ed] inflammatory political ... views' "), and that thereby implicated first amendment privacy rights. Whether the inspection of commercial mail can ever implicate such rights seems doubtful, but we need not resolve that question absent a concrete factual situation giving rise to a colorable first amendment privacy claim.
 
 
 11
 Reading Rodriguez's claims broadly, see Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972), we do address the constitutionality of the substantive restrictions on the content of inmate prison mail that the inspection provisions of Directive 4422 were designed to implement. Inspection of commercial mail is intended to limit the monetary obligations assumed by inmates and to require that inmates prepay for items ordered by mail. The regulation effectively prevents inmates from entering into a variety of commercial relationships involving debt. We assume for purposes of this case that expression aimed at entering into such commercial relationships implicates the first amendment. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 64, 103 S.Ct. 2875, 2878, 77 L.Ed.2d 469 (1983).
 
 
 12
 The appropriate standard for deciding whether a particular regulation or practice relating to inmate correspondence impermissibly restrains first amendment rights was recently articulated by the Supreme Court in Turner v. Safley, --- U.S. ----, 107 S.Ct. 2254, 64 L.Ed.2d 96 (1987). The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 107 S.Ct. at 2261. The Court listed several factors to be considered in determining the reasonableness of such a regulation, including whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," whether "alternative means of exercising the [constitutional] right ... remain open to prison inmates," and whether an alternative regulation could "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests." Id. at 107 S.Ct. at 2262 (quoting Block v. Rutherford, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)). The Court concluded that a Missouri rule barring virtually all correspondence between inmates in the state prison system was "reasonably related to legitimate security interests." Id. at 107 S.Ct. at 2262.
 
 
 13
 The business mail policies at issue in this case are necessary, according to prison officials, to prevent inmates from committing fraud on businesses or from obligating funds beyond their means. The legitimacy of the state's interest in preventing fraud or profligacy by inmates, and thereby promoting the penological objectives of "security, order, and rehabilitation," Procunier v. Martinez, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974), cannot seriously be questioned. An inmate who seeks to defraud a business is engaging in conduct that is both illegal and at odds with the rehabilitative goals of incarceration. An inmate who amasses large debts has not learned the financial responsibility that is essential for complete rehabilitation. See Matter of Milburn v. McNiff, 108 A.D.2d 860, 861, 486 N.Y.S.2d 19, 21 (App.Div.) ("Milburn II ") (controlling inmate's commitment of scarce funds serves "substantial governmental interest in '[p]reventing prisoners from running up what are essentially uncollectable debts' ") (quoting Matter of Milburn v. McNiff, 91 A.D.2d 1024, 1026, 458 N.Y.S.2d 252, 254 (App.Div.1983)), appeal discontinued, 65 N.Y.2d 812 (1985).
 
 
 14
 It is evident that a "valid, rational connection" exists between Directive 4422 and the legitimate governmental interests that the directive was designed to promote. See Turner, --- U.S. at ----, 107 S.Ct. at 2262. Prison officials cannot ascertain whether an inmate is attempting to perpetrate a fraud or to incur excessive debt without examining the contents of his or her business mail.
 
 
 15
 Moreover, Directive 4422 has a significantly lesser impact on inmates' exercise of their first amendment rights than the rule upheld in Turner. The Missouri rule barred inmates from communicating in any manner with inmates at other state prisons. In contrast, Directive 4422 does not prevent inmates from communicating with anyone so long as they submit their correspondence unsealed for inspection and obtain approval for any obligation of funds.
 
 
 16
 Finally, no alternative regulation could "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests." Id. at 2262. In striking down an earlier version of the directive insofar as it treated mail to the media as business mail, an application that directly implicated first amendment privacy interests,[4] a New York court suggested that a disclaimer be stamped on outgoing correspondence stating that credit purchases by inmates are unauthorized. Milburn II, 108 A.D.2d at 863, 486 N.Y.S.2d at 22. Presumably, such a disclaimer would cause reasonable merchants not to extend credit and thus prevent inmates from committing funds beyond their means.
 
 
 17
 However, such a disclaimer would not serve all of the rehabilitative purposes of Directive 4422. First, attempts by inmates either to commit fraud or simply spend beyond their means would go undetected without inspection of business mail. Such acts fall within the scope of the prison administration's interest in rehabilitation. An unsuccessful attempt at fraud is no less undesirable for rehabilitative purposes than a successful one. Second, inmates who try to spend beyond their means, even if they fail, have not learned one of the valuable lessons that correctional systems may legitimately teach. Third, there is no guarantee that any method short of inspection will prevent fraud or excessive commitment of funds. Even if the disclaimer makes clear that the sender is a prisoner, representations by the inmate might lead a merchant to believe, either reasonably or foolishly, that the prisoner has the means to pay for the merchandise or services ordered.
 
 
 18
 We therefore affirm.
 
 
 
 *
 The Honorable Robert C. Zampano, Senior United States District Judge for the District of Connecticut, sitting by designation
 
 
 [1]
 The full text of the business mail provisions in effect during late 1985 is as follows:
 E. Business Mail
 All correspondence addressed to a business entity shall be considered business mail and shall be processed as follows:
 
 
 [1]
 All requests by an inmate to obligate the inmate's funds (e.g., requests to an outside vendor for goods or services, requests to join a book or record club, etc.) must be approved by the Superintendent or his designee
 
 
 [2]
 All business mail, except business mail addressed to the Media and not otherwise obligating the inmate's fund, will be submitted by the inmate unsealed. Such business mail is subject to inspection
 
 
 [3]
 All business mail obligating the inmate's funds must have attached to it an approved IAS 2706 Disbursement Form. When processing this business mail, the facility must ensure that the inmate has sufficient funds, and if sufficient funds are available, a check or money order will be drawn against the inmate's account and inserted in the envelope as advance payment
 
 
 [4]
 All business mail addressed to the Media and not otherwise obligating the inmate's funds may be submitted by the inmate sealed. Such business mail shall not be subject to opening, inspection, or confiscation, except in accordance with the provisions of Section III-B-2 above
 A modification to Sec. III(E)(4) exempting all mail to the media from the inspection requirement was apparently pending, but not yet implemented, as of October 1985.
 
 
 [2]
 Although Rodriguez styled the third count of his complaint a "claim as to what DOCS and Arthur Leonardo did do," he named as defendants only Leonardo and the "DOCS Chief Employee of Records, Albany, N.Y." The latter was never served because of inadequate identifying information, and a motion for summary judgment on this claim was submitted by Leonardo alone
 
 
 [3]
 Rodriguez's complaint included a claim for damages against the defendants. Because the damage claims are asserted against the defendants in their official capacities, they are barred by the eleventh amendment. It is clear from the defendants' submissions that the actions of which Rodriguez complains were not random unauthorized acts, but the implementation of a correctional policy of the State of New York. Rodriguez's action is thus brought against these defendants in their official capacities, and "as the state would eventually have to pay any damages awarded, the suit is barred by the eleventh amendment." Jones v. Smith, 784 F.2d 149, 152 (2d Cir.1986) (dismissing damage claims in action involving constitutional challenge to different provision of Directive 4422). Our remedial power in this case is therefore limited to prospective injunctive relief. See Edelman v. Jordan, 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974)
 
 
 [4]
 After Milburn II, however, a New York court rejected a first amendment challenge to the precise business mail policies at issue here on the ground that they "do not implicate the petitioner's First Amendment rights, and further legitimate governmental objectives in a rational manner." Lucas v. Scully, 509 N.Y.S.2d 640, 641 (N.Y.App.Div.1986)