Roberto **RODRIGUEZ**, Plaintiff,

v.

Michael **AMES**, et al., Defendants.

No. 99–CV–6665L.

United States District Court, W.D. New York.

Sept. 30, 2002.

Roberto Rodriguez, Ossining, NY, Pro se.

Emil J. Bove, Office of New York State Attorney General, Darren Longo, Asst. Attorney General, Rochester, NY, for Defendants.

*DECISION AND ORDER*

LARIMER, Chief Judge.

## INTRODUCTION

Plaintiff, Roberto Rodriguez ("Rodriguez"), brought this action alleging numerous violations of 42 U.S.C. § 1983. At all times relevant to this action, plaintiff was an inmate in the custody of the New York State Department of Correctional Services ("DOCS"). Counts two, five, and six of plaintiff's twelve-count complaint were previously dismissed by this Court pursuant to 28 U.S.C. § 1915(e)(2)(B).[1] Defendants now move for partial summary judgment pursuant to Fed.R.Civ.P. 56(c), seeking the dismissal of counts three, four, and seven through eleven. Defendants also request the denial of all declaratory and injunctive relief sought by plaintiff, as well as the dismissal of all causes of action brought against them in their official capacities.

## DISCUSSION

 Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000) (quotations omitted). Where, as here, the plaintiff is proceeding *pro se*, the court must "read the pleadings . . . liberally and interpret them to raise the strongest arguments that they suggest." *Corcoran v. New York Power Authority*, 202 F.3d 530, 536 (2d Cir.1999) (quotations omitted). Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez*

---

**1.** The Court's decision and order, entered February 7, 2002, also dismissed various portions of the remaining counts.

*v. Hahn,* 209 F.Supp.2d 344, 348 (S.D.N.Y. 2002) (quoting *Parkinson v. Goord,* 116 F.Supp.2d 390, 393 (W.D.N.Y.2000)).

## A. Denial of Medical Care Claims

Prison medical care, or a lack thereof, may constitute cruel and unusual punishment, in violation of the Eighth Amendment, where a defendant acts with 'deliberate indifference to [a prisoner's] serious medical needs.' *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). A deliberate indifference claim includes both an objective and a subjective component. "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)). A sufficiently serious medical condition is "a condition of urgency that may result in degeneration or extreme pain." *Id.* (quotations omitted).

Second, subjectively "the defendant 'must act with a sufficiently culpable state of mind.'" *Id.* (quoting *Hathaway,* 37 F.3d at 66). To establish that a defendant acted with the requisite deliberate indifference, the plaintiff must show that " 'the prison official knew of and disregarded the plaintiff's serious medical needs.'" *Harrison,* 219 F.3d at 137 (quoting *Chance,* 143 F.3d at 703).

Here plaintiff alleges that various medical personal from two different facilities were deliberately indifferent to his medical needs. Plaintiff was incarcerated at the Southport Correctional Facility ("Southport") from April 7, 1998 to August 7, 1998. Plaintiff alleges that during his stay at Southport, defendant John Alves, a physician and the Facility Health Services Director, failed to diagnose plaintiff's bowel disorder.

In August of 1998, plaintiff was transferred from Southport to the Collins Correctional Facility ("Collins"). Plaintiff claims that while at Collins, defendant Joseph Tan, a physician, also failed to diagnose his bowel disorder and performed an improper examination in plaintiff's cell. Plaintiff also claims that Tan failed to provide him with orthopedic sneakers. Defendant Victor Herbert, the Superintendent at Collins, supported Tan's determination regarding the sneakers and is also charged with deliberate indifference. Finally, plaintiff alleges that defendant Shelley Steeprock, a nurse practitioner, failed to properly treat an injury to his right hand.

### 1. Treatment of Plaintiff's Bowel Disorder

### a. Claim Against Defendant Alves

Plaintiff claims that he first observed and complained of the presence of blood in his stool on March 8, 1998, while incarcerated at the Auburn Correctional Facility ("Auburn"). It was determined at the time that plaintiff was suffering from hemorrhoids. Plaintiff complained about this condition several times in April of 1998. Plaintiff's stool tested positive for the presence of blood and he was scheduled to see a Dr. Graceffo. However, plaintiff was transferred to Southport before this examination could be performed.

Plaintiff charges that Dr. John Alves ("Alves"), the Facility Health Services Director at Southport, was deliberately indifferent to his serious medical needs because he failed to diagnose and treat this condition, despite the presence of blood in plaintiff's stool documented during his stay at Auburn. Complaint, Count 3, ¶ 4. In his response to Alves's motion for summary judgment, plaintiff also suggests that Alves must have been notified of his condi-

tion because the Inmate Records Coordinator at Auburn would have informed Alves of plaintiff's bowel disorder. Aff. Rebutting Alves Aff., ¶ 12. Plaintiff, concedes, however, that during his time at Southport, Alves never actually examined him. *Id.* at ¶ 4.

A careful examination of the record has not revealed any evidence that Alves was personally aware of plaintiff's medical condition. When plaintiff was transferred from Auburn to Southport, he was initially interviewed concerning his current medical condition. The record of that health screening and medical orientation make no mention of plaintiff's complaints of blood in his stool. Aff. Rebutting Alves Aff., Ex. F. Plaintiff's medical records from Southport show that he first complained of this condition on April 17, 1998. Alves Aff., Ex. D. It was noted that plaintiff suffered from hemorrhoids. A record from May 3, 1998, states that plaintiff tested positive for blood in his stool in March of 1998, before his transfer to Southport. This condition is not mentioned again until July 13, 1998, when it is noted that there has been no follow up on the March 1998 test result. A check of his stool for occult blood was ordered, and it was noted that the examiner would follow up with a nurse practitioner. On July 18, 1998, the test returned positive for blood. There is no indication in any of these records that Alves was informed of plaintiff's condition. Moreover, other than making a general allegation that Alves must have known of his condition, plaintiff offers no evidence to suggest that any of the medical staff had as of yet informed Alves of plaintiff's disorder.

On July 27, 1998, plaintiff was examined by a nurse practitioner. Alves Aff., Ex. B. The examination was normal, with the exception of the report of blood in plaintiff's stool. The record indicates that the nurse practitioner would follow up with Dr. Alves. Two days later, Dr. Alves ordered a sigmoidoscopy. Alves Aff., Ex. A. Unfortunately, plaintiff was transferred from Southport before this test could be performed.

Assuming *arguendo* that plaintiff's medical condition was, in fact, sufficiently serious, in order to establish that Alves acted with a sufficiently culpable state of mind, plaintiff must show that Alves "knew of and disregarded the plaintiff's serious medical needs." *Harrison*, 219 F.3d at 137 (quoting *Chance*, 143 F.3d at 703). Alves is not responsible for delays or gaps in treatment solely because he is the Facility Health Services Director. *Brady v. Griffith*, 1998 WL 814630, at *5 (S.D.N.Y. Nov. 23, 1998). The only evidence concerning Alves's knowledge of plaintiff's condition indicates that he first was notified of plaintiff's problem on July 27, 1998. Alves then quickly scheduled the necessary testing.

Based on the evidence discussed above, plaintiff has not established that Alves was deliberately indifferent to his serious medical needs. Therefore, defendants' motion for summary judgment is granted, and count three of plaintiff's complaint is dismissed.

### b. Claim Against Defendant Tan

Plaintiff charges that further delays in his treatment occurred following his transfer to Collins in August of 1998. Plaintiff claims that Dr. Joseph Tan ("Tan"), a physician at Collins, somehow contributed to this delay. Plaintiff also claims that Tan conducted an improper examination in the presence of plaintiff's cell mate.

Plaintiff claims that Tan examined him in his cell on August 19, 1998. No record of this examination exists, and Tan denies examining plaintiff on this date. On August 26, 1998, Dr. John Cetin ("Cetin"), a physician at Collins, requested a gastroin-

testinal consultation for plaintiff. Cetin Aff., Ex. A. The consultation was performed on September 9, 1998. The consulting physician, Dr. James Piscatelli, recommended that plaintiff undergo a colonoscopic examination. *Id.* at Ex. B. Dr. Cetin scheduled a colonoscopy for October 13, 1998. Because no security escort was available on that day, the colonoscopy was rescheduled for November 10, 1998. Following this examination, plaintiff was diagnosed with probable mild distal proctitis and internal hemorrhoids. *Id.* at Ex. E. The recommended treatment was over-the-counter Anusol suppositories. Cetin Aff., ¶ 18.

Assessing the facts in the light most favorable to plaintiff, Tan was the first physician at Collins to exam plaintiff regarding his bowel disorder. After this examination, no entry was made into plaintiff's medical records. Following this initial examination, the record does not indicate, nor does plaintiff allege, that Tan was involved in any way in the treatment of plaintiff's bowel disorder. Seven days after Tan's examination, another physician requested a gastrointestinal consultation for plaintiff.

■ Plaintiff has not articulated how Tan contributed to any delay in treating his bowel disorder. Moreover, the actual delay between Tan's examination and further medical action was only seven days. Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, *Baskerville v. Blot,* —— F.Supp.2d ——, 2002 WL 31098504, at *9 (S.D.N.Y.2002) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104–105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)), a prisoner's Eighth Amendment rights are violated only where "the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condi-

tion or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment," *Rodriguez v. Mercado,* 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002) (quoting *Amaker v. Coombe,* 2002 WL 523388, at *8 (S.D.N.Y. Mar.29, 2002)). Plaintiff has made no attempt to establish that this seven-day delay somehow caused his condition to deteriorate, or that he suffered extreme pain. In fact, plaintiff admits that he suffered "no pain as a result of his rectal condition." Plaintiff's Rule 56(e) Statement, ¶ 3.

■ The crux of plaintiff's complaint centers around the delay in treatment between his first complaints in March of 1998, while he was incarcerated at Auburn, and his eventual diagnosis in November 1998, while housed at Collins. Most of the delay in plaintiff's treatment can be attributed to plaintiff's transfer from Auburn to Southport and eventually to Collins. *See Ross v. Kelly,* 784 F.Supp. 35, 47–49 (W.D.N.Y.1992) (holding frequent transfers did not amount to denial of medical care). Although the lag in treatment is unfortunate, certainly, defendant Tan cannot be held accountable for this delay.

Plaintiff has not shown that Tan was deliberately indifferent to his serious medical needs. Therefore, defendants' motion for summary judgment is granted, and the Eighth Amendment claim against Tan articulated in count seven of plaintiff's complaint is dismissed.

In addition to the Eighth Amendment claim discussed above, plaintiff claims that following the filing of a grievance regarding a lack of medical care, on August 19, 1998, Tan conducted a rectal examination of plaintiff in his cell in the presence of his cell mate. Plaintiff claims that this exami-

nation violated his right to bodily privacy.[2] It appears that plaintiff filed a grievance regarding this examination. Although the grievance was denied, the determination did indicate that the "named doctor" and a nurse visited plaintiff in his cell. "The doctor discussed the issue with the Grievant and then asked to see Grievant's rectal area in order to plan an appropriate treatment." *See* Complaint, Attachment to Count 7. Tan denies that any such examination occurred.

Although defendant Tan has moved to dismiss the Eighth Amendment claim against him, his brief makes no mention of plaintiff's privacy claim. Therefore, the Court will not address whether the allegations made by plaintiff are sufficient to establish a constitutional deprivation. The Court grants defendant Tan leave to move for summary judgment on this issue within sixty days of the entry of this decision and order. Should Tan elect to so move, he should address whether plaintiff's allegations can establish a violation of § 1983 and whether he would be entitled to the defense of qualified immunity.

## 2. Plaintiff's Request for Orthopedic Sneakers

### a. Claim Against Defendant Tan

Before plaintiff was transferred to Southport, he was seen by an "orthopedic specialist," who recommended that plaintiff be issued a pair of orthopedic boots. It appears that plaintiff was issued these boots, and utilized them during his stay at Southport. Plaintiff later requested "orthopedic sneakers," because boots were not permitted in the section of the facility where plaintiff was housed.

Tan examined plaintiff's feet on March 12, 1999. Plaintiff claims that Tan, "for no apparent reason," denied his request for orthopedic sneakers. Complaint, Count 9, ¶ 5.

After examining plaintiff's feet, Tan diagnosed plaintiff with "synovial cysts." Tan Aff. ¶ 18; and Ex. E. These cysts are liquid filled, and according to Tan, do not cause discomfort. For this reason, Tan denied plaintiff's request for special boots or sneakers.

Plaintiff disputes Tan's diagnoses and suggests that these growths are not soft in nature. Aff. Rebutting Tan's Aff., ¶ 22. Plaintiff complains that the state-issued sneakers cause him " 'unnecessary' discomfort on his feet as he walk[s]." *Id.* at ¶ 23.

 In order to establish "an Eighth Amendment claim for medical indifference, [plaintiff] must first allege a sufficiently serious deprivation that is, 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)). Here, plaintiff has alleged only that standard-issue sneakers provided to him caused "unnecessary discomfort." Such a claim falls short of establishing the existence of a serious medical condition.

### b. Claim Against Defendant Herbert

Following his failed attempts to receive orthopedic sneakers, plaintiff filed a grievance. Initially, his grievance was heard by the Inmate Grievance Resolution Committee, which recommended that plaintiff receive the requested sneakers. In accordance with DOCS's policy, then

**2.** Although the Court's February 7, 2002 decision and order dismissed the portion of plaintiff's claim charging that Tan improperly disclosed his medical condition to others, the Court did not address the privacy claim relative to the alleged in-cell examination.

Superintendent of Collins Victor Herbert ("Herbert") reviewed the recommendation. Ultimately, he denied plaintiff's grievance. Herbert's determination was reviewed and affirmed by the Central Office Review Committee, which found that there was no medical reason for plaintiff to obtain special orthopedic footwear.

■ As discussed above, plaintiff has not established the existence of a serious medical condition with respect to his request for orthopedic footwear. As such, Herbert could not have acted with deliberate indifference to plaintiff's serious medical needs in refusing to order the issuance of special sneakers. Defendants' motion is granted, and count ten is hereby dismissed.

### 3. Plaintiff's Injury to his Right Hand

On May 27, 1999, during an altercation with his cell mate, plaintiff injured his hands. The record indicates that plaintiff was seen by a Nurse Bensley on the day of his injury. Steeprock Aff., ¶ 10, and Ex. A. Bensley ordered X-rays. Steeprock examined plaintiff the next day and prescribed Motrin for plaintiff's pain. Steeprock Aff., Ex. B. Steeprock examined plaintiff again on June 3, 1999. *Id.* at Ex. C. She noted in plaintiff's medical record that the official X-ray report was not yet available. She also noted that the X-ray technician reported that the films showed no obvious fractures and that plaintiff's hands showed no signs of discoloration. Steeprock states that "as a precaution," she ordered an orthopedic consult. Steeprock Aff., ¶ 16. The X-ray report was issued on June 4, 1999, and sent to Steeprock via facsimile on June 11, 1999. The report indicated an "acute impacted fracture involving the distal right 4th metacarpal." Steeprock Aff., Ex. D. Plaintiff was

transported to an outside emergency room later that day.

Plaintiff claims that the fifteen-day delay in treatment caused his bone to heal improperly, rendering him "disfigured." He blames Steeprock for this delay in treatment, alleging that because she was supervising his medical care, she was responsible for ensuring that he received treatment.

■ Although a delay in treatment can give rise to an Eighth Amendment claim, plaintiff cannot show that Steeprock disregarded plaintiff's serious medical needs. *See Harrison,* 219 F.3d at 137 (quoting *Chance,* 143 F.3d at 703). To the contrary, Steeprock's conduct can only be described as responsive to plaintiff's injury. She examined plaintiff the day after his injury and prescribed pain medication. When she examined plaintiff one week later, she ordered an orthopedic consultation, despite the absence of an X-ray report and the opinion of the X-ray technician that the films showed no obvious fractures. Steeprock did not receive the X-ray report until 12:30 p.m. on June 11, 1999, and thus had no knowledge of the fracture until that date. Plaintiff was then transported to the Erie County Medical Center in a timely fashion—approximately four hours after Steeprock received the report.

Plaintiff has not shown that Steeprock was deliberately indifference to his serious medical needs. Defendants' motion for summary judgment is granted, and count eleven is hereby dismissed.

### B. Failure to Allow Mail from Penn–Pals Prison Inmate Services Network

A packet of information from "Penn–Pals, Prison–Inmate Services Network" was mailed to plaintiff in mid-June of 1998. Based on the information submitted by

plaintiff, Penn–Pals appears to be an organization that will, for a fee, place a prisoner's information onto its internet site. Visitors to the site may chose to write to inmates who advertise there. The packet of information from Penn–Pals was returned to the sender marked "prohibited material." Plaintiff claims that this action inferred with his right to communicate with the outside world, and charges that Deane Gardner ("Gardner"), Senior Mail and Supply Clerk at Southport, is responsible for this violation of his rights.

Prison inmates have a constitutional right to send and to receive mail. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). These rights, however, "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Thornburgh v. Abbott*, 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (quoting *Turner*, 482 U.S. at 85, 107 S.Ct. 2254). Prison officials have the difficult task of determining when "certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Thornburgh*, 490 U.S. at 407, 109 S.Ct. 1874. Given the unique expertise of prison officials in this area, and "that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management," "considerable deference" should be afforded "to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Id.* at 407–408, 109 S.Ct. 1874. Thus, interference with a prisoner's mail is permissible where it is "reasonably related to a legitimate penological interest." *Turner*, 482 U.S. at 85, 107 S.Ct. 2254.

In determining whether such a restriction is constitutionally permissible, a court must consider:

(1) whether there is a rational connection between the restriction and the legitimate governmental interest used to justify it; (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the right will have an adverse impact on guards, other inmates, and prison resources generally; and (4) whether obvious, easy alternative to the restrictions exist.

*Purnell v. Lord*, 952 F.2d 679, 683 (2d Cir.1992) (citing *Turner*, 482 U.S. at 89, 107 S.Ct. 2254).

Inmate correspondence is governed by DOCS Directive 4422. Directive 4422(III)(B)(16) prohibits inmates from using "their correspondence privileges to solicit or otherwise commercially advertise for money, services, or goods." Gardner argues that this directive prohibits groups like Penn–Pals from marketing their services to inmates and also prohibits inmates from soliciting such services. Gardner also points to two memoranda from the then Deputy Commissioner of DOCS, prohibiting the receipt of information from a group called Pen–Pals of America and T.C.M. Services. These services, however, are described as offering photographs of males or females to inmates in exchange for cash or postage stamps. Gardner Aff., Ex. B and C.

The Second Circuit has approved the application of DOCS directive 4422 as it relates to the regulation of business mail. *Rodriguez v. James*, 823 F.2d 8, 12–13 (2d Cir.1987). Applying the *Turner* factors, the court determined that the state had articulated a legitimate interest in the inspection of commercial mail—namely preventing inmate fraud and profligacy. Applying the *Turner* factors to the case at

hand, the question now before this Court is whether prison officials, by relying on Directive 4422(III)(B)(16) and prohibiting plaintiff from receiving information from Penn–Pals, improperly interfered with plaintiff's First Amendment rights.

First, the restriction at issue here prevents prisoners from soliciting or otherwise commercially advertising for money, services, or goods. Because an inmate could place an ad soliciting correspondence, or perhaps seeking money or food, an inmate is barred by 4422(III)(B)(16) from utilizing Penn–Pal's services. Because the use of such services would be prohibited, materials from such companies are not forwarded to inmates. I find that there is a rational connection between this restriction and the legitimate governmental interest used to justify it—prison security.

Moreover, there are alternative avenues that will allow plaintiff to exercise his First Amendment rights. Plaintiff claims that Gardner's actions prohibited him from communicating with the outside world. However, plaintiff has made no showing that his ability to send mail and to communicate with others has in anyway been restricted. Plaintiff is not prohibited from writing to private citizens, or even from having a "pen pal." The restriction here generally prevents plaintiff from subscribing to a pen pal service that charges a fee and from receiving mail from companies marketing such a service.

In addition, allowing inmates to subscribe to such a service could have an adverse impact on guards, other inmates, and prison resources generally. For example, prison officials could be called upon to monitor inmate ads placed with these services in order to determine if inmates are soliciting money, food, or contraband. Likewise, the forwarding of materials offering a prohibited service to an inmate could force prison officials to monitor outgoing mail for attempts to sign up for such services. Although Directive 4422(III)(E)(4) authorizes the inspection of outgoing inmate business mail, it is conceivable that an inmate could send such correspondence without properly addressing the item as business mail. Monitoring *all* the outgoing mail of inmates who have received solicitations from pen pal services would be unduly burdensome, not to mention constitutionally questionable.

Finally, plaintiff has not suggested that another easy alternative to this restriction exists. In fact, plaintiff's chief concern—that he is restricted from corresponding with the outside world—is not implicated by the acts complained of here.

The automatic return of mail from Penn–Pals does not infringe upon plaintiff's First Amendment rights. Therefore, defendants' motion for summary judgment is granted, and count four of the complaint is dismissed.

## C. Presence of Defendant Swiatek During a Legal Call

On November 12, 1998, plaintiff attempted to secure legal representation for a potential § 1983 action. According to plaintiff, corrections counselor Daniel Swiatek ("Swiatek") monitored his conversation by standing just three feet away from plaintiff for the duration of this call. Plaintiff claims that Swiatek violated his Sixth Amendment "right to privacy while speaking to an attorney." Complaint, Count 7.

Although plaintiff suggests that Swiatek interfered with a conversation with his attorney, in fact, plaintiff spoke only to a paralegal employed by an attorney that plaintiff *hoped* would agree to represent him. The paralegal informed plaintiff that the attorney would not take plaintiff's case.

The right to counsel provided for in the Sixth Amendment "extends only to criminal and quasi-criminal proceedings." *In re Martin–Trigona*, 737 F.2d 1254, 1260 (2d Cir.1984). Here, plaintiff was seeking counsel regarding a potential § 1983 action. Thus, his Sixth Amendment rights could not have been abridged by Swiatek's presence. Moreover, plaintiff was not communicating with an attorney (or a member of his or her staff) who had agreed to represent plaintiff in any capacity.

Finally, even if plaintiff's claim could be construed as alleging a denial of access to the courts, plaintiff can show no harm arising out of Swiatek's presence. Plaintiff was seeking representation regarding matters which became the subject of the § 1983 action currently pending before this Court. Considering plaintiff's vigorous self-representation and the voluminous filings submitted by plaintiff in support of his claims, plaintiff's access to the courts has in no way been impinged upon. *Davidson v. Goord*, 2000 WL 33174399, at *5 (W.D.N.Y. Sept. 27, 2000) (citing *Lewis v. Casey*, 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). Therefore, defendants' motion for summary judgment is granted, and count eight of plaintiff's complaint is hereby dismissed.

### D. Plaintiff's Request for Injunctive or Declaratory relief

Plaintiff makes several requests for injunctive relief. He asks the Court to order Attica Correctional Facility ("Attica"), the facility where he was housed at the time his complaint was filed, to provide him with orthopedic sneakers. He also asks the Court to require Attica to send plaintiff for occupational therapy for his left hand.[3] As discussed above, plaintiff has not established a constitutional violation with respect to the denial of orthopedic sneakers or the treatment of plaintiff's hand injury. Moreover, plaintiff has not raised a claim against any Attica official or physician. Therefore, these requests for injunctive relief are hereby denied.

Plaintiff also asks the Court to order all prison officials to cease censoring his mail, and to prevent any retaliation related to the filing of this lawsuit. Plaintiff has neither alleged nor established any censorship or retaliation related to this lawsuit. Plaintiff's request is, therefore, denied.

Finally, plaintiff's request for "a statement about the limits of all of plaintiff's rights before they are violated" is likewise denied.

### CONCLUSION

Defendants' motion for partial summary judgment (Dkt. # 133) is granted, and counts three, four, and eight, nine, ten, and eleven are hereby dismissed. The Eighth Amendment claim against defendant Tan articulated in count seven of plaintiff's complaint is dismissed. Defendant Tan is granted leave to move for summary judgment on the privacy claim expressed in count seven of plaintiff's complaint within sixty days of the entry of this decision and order. Should Tan elect to so move, he should address whether plaintiff's allegations can establish a violation of § 1983 and whether Tan would be entitled to the defense of qualified immunity.

Plaintiff's requests for declaratory and injunctive relief are hereby denied.

To the extent that the remaining defendants are named in their official capacities,

---

**3.** Moreover, plaintiff's claim against defendant Steeprock challenged the treatment of plaintiff's *right* hand.

those claims are dismissed. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529–530 (2d Cir.1993). The only claims remaining are against defendants Michael Ames and B. Pelz, as named in their individual capacities in counts one and twelve, and against defendant Tan, as named in his individual capacity in the privacy claim articulated in court seven.

IT IS SO ORDERED.